Harold P. Kelly, J.
The plaintiff brings this action seeking a permanent injunction prohibiting the sale of the defendant, Cornell Aeronautical Laboratory, Inc. (CAL) to the defendant, EDP Technology, Inc. (EDP) or to any other purchaser, by the defendant, Cornell University (Cornell). The defendants, Cornell and CAL seek a judgment declaring that Cornell may, without restriction, dispose of CAL, or of any or all of the land, buildings, personal property and other facilities owned by CAL and dismissing the complaint. The defendant Cornell has agreed to sell the capital stock of CAL to the defendant EDP. Justice Frederick M. Marshall has heretofore granted a temporary injunction restraining this sale until the trial of the issues in this action could be had.
On December 13, 1945, Curtis-Wright Corporation, after preliminary negotiations between itself and Cornell, presented a formal written proposal to give or donate to Cornell its 11 Wind Tunnel and Research Laboratory ’ ’ facilities, located at Cheektowaga, New York. The proposals, besides providing among other things for the completion of work then being performed at the facility and for the conducting of future research for Curtis-Wright, also provided that Curtis-Wright would donate money to complete the wind tunnel. An underlying condition of the entire proposal was that the gift be consummated for tax reasons before January 1, 1946. Cornell accepted the proposal and the laboratory facilities were transferred to it by deed and bill of sale. At the same time, gifts of cash aggregating $675,000 were received by Cornell from six aircraft manufacturers which was utilized to provide working capital for the laboratory.
The deed and bill of sale were dated December 21,1945. Both recite a consideration of $1 “ and the advancement of science and education ”.
The laboratory was leased to Cornell Research Foundation, Inc. and it was operated as a division of the Foundation from January 1, 1946 until May 31, 1948. Cornell Aeronautical Laboratory, Inc. was incorporated on March 4, 1948 and on June 1, 1948 it acquired from Cornell University and Cornell Research Foundation, Inc. all of the assets which were then being used and it assumed the liabilities existing at that date, in connection with the operation of the laboratory, in exchange for the issuance to Cornell of the 100 shares of the corporation’s *97 stock. All of the stock issued by CAL has been continuously owned and held by Cornell and the ultimate control of the operation of the laboratory was and is in Cornell.
Although there was fear at first that the laboratory might become a financial burden on Cornell, it has since proven to be a financial success. All of the profits of the laboratory, which amounted to many millions of dollars have been ‘ ‘ plowed back ’ ’ into the laboratory and its research projects, except the sum of $1,698,882 as was paid to Cornell through June 30,1969: For fellowships, $687,776; professorships, $482,760; CAL employees teaching at Ithaca, $72,782; CAL’s share of Cornell’s administrative expense, $405,564; and, a contribution toward the cost of a Nuclear Reactor at the University of Buffalo, $50,000 (Defendants’ Exhibit 000).
Although the laboratory in the early years of its operation confined itself almost exclusively to research in the aeronautical field, it has in later years, because of a lessening in demand for the utilization of its facilities for aeronautical research and the availability of funds for other research projects, gone into research in such fields as safety studies for automobile manufacturers, fingerprint identification, mail recognition, urbanization, pollution, subjects related to space exploration and atomic energy, and many other research projects. Its sole function is research as it produces no “ hard goods ” so called.
Since Cornell acquired the laboratory, its operation has grown in size and the scope of its activities has been extended. It originally had about 500 employees. It now has in excess of 1,500 employees. Its annual dollar value of its contracts has increased over 35 times. It operates facilities for research at Washington, D. C., Wilson, New York, Batavia, New York, Newstead, New York, Thailand, Ashford Hollow, New York and Eglund Air Force Base, Florida, as well as its main facilities on Genesee Street in the Town of Cheektowaga, New York.
The primary questions to be determined by the court are whether or not the gift of the laboratory from Curtis-Wright to Cornell was a ‘ ‘ charitable trust ’■’ and, if so, was it a “ charitable trust ” with a restricted purpose which will prevent the sale of the laboratory to EDP.
There can be little argument that the gift was a “ charitable trust ” as defined in the statutes (EPTL, art. 8) and the case law of the State of New York.
“ Subdivision (a) defines the word ‘ trustee ’ as any individual, corporation or other legal entity holding and administering property for charitable purposes, whether pursuant to *98 any will or other instrument, court appointment or otherwise pursuant to law over which the Attorney General has supervisory or enforcement powers. Accordingly, whenever the word ‘ trustee ’ is used hereafter in this commentary it refers to this definition. It should be noted that this is an extension of and consistent with the holdings that although an absolute gift to a charitable corporation does not create a technical trust, a trust is implied in the sense that the disposition will be required to be devoted effectively to the purposes for which it was given. Sherman v. Richmond Hose Co., 1921, 230 N. Y. 462, 130 N. E. 613.” (Practice Commentary by Julius Greenfield in McKinney’s Cons. Laws of N. Y., Book 17B, EPTL, § 8-1.4, 1969-1970 Supplement. See, also, Saint Joseph’s Hosp. v. Bennett, 281 N. Y. 115; 7 N. Y., Jur., Charities, § 62, p. 562.)
“ Gifts for the advancement of learning, science and the useful arts generally, either with or without particular reference to the poor, are regarded as charitable.” (14 C. J. S., Charities, p. 444.)
The law favors the creation of charitable gifts and trusts and they will be upheld and declared valid when possible. (14 C. J. S., Charities, § 6, subd. a, p. 427; Bogert, Trust and Trustees [2d ed.], § 368; Matter of Durbrow, 245 N. Y. 469, 474; Matter of Frasch, 125 Misc. 381, affd. 216 App. Div. 797, affd. 245 N. Y. 174.)
In the instant case, Cornell is a charitable institution (Hamburger v. Cornell Univ., 204 App. Div. 664, affd. 240 N. Y. 328) and the gift was for “the advancement of science and education. ’ ’ The gift was, therefore, a ‘ ‘ charitable trust ’ ’ and subject to the Rules Governing Charitable Trusts as set forth in article 8 of EPTL.
The next question to be considered by the court is whether the gift of the laboratory was limited and restricted to a particular educational purpose or whether it could be sold and the proceeds used for general educational purposes as Cornell may determine.
A charitable trust for the advancement of education may be for general or specific education purposes such as research. (Bogert, Trusts and Trustees [2d ed.], § 375; 14 C. J. S., Charities, p. 445.)
The purpose of the gift stated in the deed and bill of sale for ‘ ‘ the advancement of science and education ’ ’ leaves open the question of how the donee was to use the laboratory in the advancement of science and education. ‘ ‘ Where the writing does not appear to express the entire agreement of the parties, evidence that the portion in writing does not constitute the complete contract, or to show what the contract really was, is admissible.” (1 Mottla, New York Evidence — Proof of Cases [2d *99 ed.], § 142; to the same effect, Richardson, Evidence [9th ed.], §§ 583, 590.)
In view of the fact that the formal documents transferring the property from the donor to the donee did not express the entire agreement of the parties, the court can examine into the facts and circumstances surrounding the gift. (Matter of Smith, 254 N. Y. 283, 289; Matter of Shumway, 138 Misc. 429, 432; Butterworth v. Keeler, 219 N. Y. 446, 451; Matter of Patterson, 139 Misc. 872, 875; Matter of Fontanella, 33 A D 2d 29, 30.) “ No particular form of words or conduct is necessary for the manifestation of intention to create a trust.” (Restatement, Trusts 2d, §§ 24, 351; see, also, 4 Scott, Trusts [3d ed.], p. 2794; Matter of Tiffany, 157 Misc. 873, 880-881; Matter of Fontanella, supra)
One of the most important facts that bears on this question is the nature of the gift itself. The gift in the instant case was a fully-staffed operating research laboratory and wind tunnel at the time of the transfer to Cornell. In addition, Cornell itself understood that it was accepting a gift of a research laboratory and that there was an obligation to continue to operate the laboratory as a research facility for the public benefit. Among the exhibits which exemplify this understanding of Cornell are defendants’ Exhibits numbered C, G; plaintiff’s Exhibits numbered 1, 1A, 2, 2A, 3, 3A, 4, 4A, 5, 5A, 19 and 26. Although the court has listed a few of the exhibits, an examination of most of the exhibits and the testimony of the witnesses also support this understanding by Cornell of its obligations in accepting the gift. Defendants ’ Exhibit C, which is the minutes of the January 21, 1946 meeting of the “Interim Policy and Operating Committee for Cornell Aeronautical Laboratory At Buffalo ” stated the conclusion of this committee as to the method of operating the laboratory and of major significance “ that any profit made by the laboratory should be either ‘ plowed back ’ into the laboratory or turned over to Cornell for educational research.” The action taken by this committee in its meeting of January 21, 1946 was approved by the executive committee of Cornell at a meeting on February 9, 1946 (Defendants’ Exhibit G). On May 1, 1948, we find the following in the minutes of the board of trustees of Cornell: “ it (CAL) will never be profitable as far as university is concerned because the money goes back into the research projects and cannot go out of the organization. It is organized as a non-profit organization ” (Plaintiff’s Exhibit 21). In plaintiff’s Exhibit 26 the CAL policy of operation dated November 30, 1953 — I — the Basic Objective, says: “ The Cornell Aeronautical Laboratory, *100 operating within the/ limits of its certificate of incorporation and its by-laws, and as a wholly-owned subsidiary of Cornell University, is to engage in research and educational activities in scientific fields for the purpose of advancing and enlarging scientific and engineering knowledge. This shall include the dissemination and use of new knowledge, encouraging and fostering scientific and engineering education, and contributing to the welfare of the nation and the public at large. ’ ’
The evidence adduced on the trial shows that except for small amounts the “profit” made by the laboratory was “plowed back” into the laboratory for research from the beginning of Cornell’s operation until now and the profits were not used for the general benefit of Cornell except as shown in defendants’ Exhibit 000, but, in fact, were used for the public benefit.
Prom the evidence relating to the circumstances surrounding the gift of the laboratory from Curtis-Wright to Cornell and the clear understanding of the parties, it appears that a ‘ ‘ charitable trust ” was created for the restricted purpose of conducting a laboratory to conduct scientific research and not for the purpose of supporting the general educational programs of Cornell.
Although it is not necessary for a determination of this action, it is the opinion of the court that Cornell by its actions and the use of the laboratory for research purposes over the years and the use of the income almost entirely for research purposes as the laboratory itself created a charitable trust or use for that purpose, which now prevents the diversion of the laboratory or the income therefrom to an entirely different purpose. (Authors Club v. Kirtland, 248 App. Div. 82, 86.)
In that case, the court after pointing out that the Authors Club had set aside the various gifts in a separate trust fund, the income to be used for specific trust purposes pointed out that “ From this aspect the plaintiff itself was the donor of the trust fund and, again, there could be no diversion of the income from the specific trust purposes.”
“ The owner of property may create a charitable trust by a declaration that he holds such property on a charitable trust ^ ^ *7?
“No formality of language nor special technical words are necessary to establish a charitable use of trust; the court looks through form to substance, So failure of the donor to make an express declaration of trust does not prevent the creation of a charitable trust, since a trust for purposes stated or intended may be implied even though the donor does not use express words of trust,” (14 C. J, S., Charities, p. 426.)
*101 The court, after considering all of the evidence adduced on the trial, comes to the conclusion that an implied charitable trust or an absolute gift was created with a restricted purpose to carry on a research laboratory for the general public good or benefit.
The fact that the laboratory broadened its research into other fields than aeronautics as more funds were available and the demand on its facilities for aeronautical research lessened did not destroy the charitable purpose of the laboratory. If anything the research now conducted at the laboratory could be said to have greater public benefit than its original research in the field of aeronautics alone.
It would appear that if a court had been called upon to approve the change in the character of the research, the change could have been approved under the cy pres doctrine.
Also, the fact that the laboratory was a profitable enterprise in the sense that its operations made money does not affect its charitable purpose, since the profits were applied only to charitable purposes and not to a private use. (Restatement, Trusts 2d, § 376; Bogert, Trust and Trustees [2d ed.], § 364; Butterworth v. Keeler, 219 N. Y. 446, 449.)
The fact that Curtis-W right’s motive in making the gift was to secure a tax saving is immaterial. The courts look to the nature and purpose of the gift. (14 C. J. S., Charities, p. 440.)
In addition, in the opinion of this court the use of the words ‘1 unrestricted ” or “ unconditional ’ ’ as applied to this gift as evidenced by the exhibits, meant that Curtis-Wright and the aircraft companies that donated money would not have any control or connection with the operation of the laboratory, and would not be given any preferential treatment over other persons or corporations using the laboratory’s facilities.
Under subdivision (g) of section 8-1.1 of EPTL it is necessary to obtain the approval of the Supreme Court to the sale of any real property which is the subject of a disposition for an educational purpose or which is owned by a corporation charged with such a purpose. In order to give such approval, it is necessary that the court be satisfied from proper proof that such real property has become or is likely to become unproductive, has depreciated or is likely to depreciate in value or that it is expedient for any other reason that such real property be sold.
In the instant case there has been a failure to show how the sale of the laboratory would in any way promote the best interest of carrying out the charitable purposes of this charitable trust.
The gift to Cornell of Cornell Aeronautical Laboratory was a charitable gift restricted to the purpose of conducting research *102 for the public interest or benefit and its purposes are capable of continued effectuation as the laboratory now exists. It is the court’s opinion that the preliminary injunction should be made permanent.